### Alexander. Jennette et al. v. Camelia Meloche.

1. FORECLOSURE—*Fraud.*—The court reviews the evidence in the case and holds that it does not successfully assail the settlement made by the defendants with full knowledge of all the facts.

**Bill to Foreclose a Trust Deed.**—Error to the Circuit Court of Kankakee County; the Hon. JOHN SMALL, Judge presiding. Heard in this court at the October term, 1902. Affirmed. Opinion filed January 27, 1903.

STEPHEN R. MOORE and HIRAM L. RICHARDSON, attorneys for plaintiffs in error.

W. H. SAVARY and H. K. & H. H. WHEELER, attorneys for defendant in error.

MR. JUSTICE DIBELL delivered the opinion of the court.

On January 28, 1898, Alexander Jennette received from Camelia Germain (now Meloche) a deed of a house and lot in Kankakee, and Jennette executed to Camelia Germain a promissory note of that date for $500, due two years after date, with interest at seven per cent per annum, and executed to Daniel H. Paddock a note for $50, due in one year, and executed to Bert L. Cooper, as trustee, a trust deed to secure said notes, and also to secure " all advances said Paddock may make in the business of said Alexander Jennette." This was a bill and an amended bill filed by Mrs. Meloche to foreclose the trust deed for the payment of her note. Jennette and wife, and Cooper and Paddock were defendants. Cooper and Paddock were defaulted. The Jennettes answered, setting up that this note and trust deed were given in settlement of a prior transaction, that they were defrauded in said prior transaction and were frightened into making this settlement. There was a hearing and a decree of foreclosure. Jennette and wife have sued out this writ of error to reverse said decree.

The main facts are as follows: A few days before the date of these instruments, Jennette owned this house and lot in Kankakee. He was in ill health, and desired to remove to Florida. He had negotiations on foot with a party by the name of Madison or Matson for some Florida property. Onisene Germain, the father of Camelia Germain, lived in Kankakee, and seems to have been acting as a real estate agent. Jennette applied to Germain to examine the papers and see if they were all right. Germain did examine them, and insisted Jennette ought not to make the trade without ascertaining from some other source than the seller if the property was what it was represented to be. He wrote a letter of inquiry on that subject for Jennette. Theophile Labounty owned a house and two lots in Le Roy, Marion county, Florida, and an orange grove of four acres near by, and a timber lot of five acres.

He had formerly lived there, but he and his wife had sepa-
rated, and he lived in Iroquois county, Illinois, and his wife
lived at St. Anne, in Kankakee county.  He wished to
sell this Florida property, and obtained a proposed pur-
chaser, but his wife refused to sign the deed because she
was not receiving a sufficient amount of the consideration.
While Germain was waiting to hear about the Madison
property he learned of this Labounty property.  He talked
about it with Mrs. Labounty, and sent for Labounty, and
brought Labounty and Jennette together.  As the result of
several interviews, a trade was effected, in which Germain
practically bought the Florida property from the Labountys
and sold it to Jennette in exchange for the Kankakee prop-
erty.  The Kankakee property was put in at $950, and
Jennette took the Florida property at $750, and Germain
paid him $200 in cash.  Germain paid Mrs. Labounty $150
and paid Labounty $100.  Germain caused Jennette to
deed the Kankakee place to Camelia Germain, the osten-
sible reason being that she contributed part of the money
which Germain paid.  Mr. and Mrs. Jennette shortly after
left for Florida.  When they arrived at Le Roy Mrs.
Labounty was sick, and they were both very much disap-
pointed with the appearance of the house in Le Roy and of
the village itself.  They found another party in possession
of the house as tenant of a third party who claimed he had
bought the property from Labounty and paid $10 on the
bargain, and who refused to surrender possession.  They
found the orange grove had been frozen and would not
bear fruit until it had been grafted or budded.  They were
evidently very homesick.  The parties claiming the prop-
erty there advised them to return and get their Kankakee
property back, and after a few days' stay at Le Roy they
returned to Kankakee.  They testify to statements made
to them by Germain as to the population of the village
which were wholly untrue, and that the house was not as
good as represented.  Jennette, however, admits that
Germain told him the orange grove had been frozen and
would not bear again till it was grafted or budded.  No

fault seems to have been found with the timber lot. We think it a reasonable inference from the evidence that before the orange trees were frozen this property was worth more than Jennette's property in Kankakee, but that at the time this contract was made it was worth much less. It is, however, by no means clear that Germain was guilty of fraud. It appears from the proof that he had never seen the property, and that the representations concerning it came originally from Mr. and Mrs. Labounty. Germain testifies that he strongly urged Jennette to go and visit this property before buying it, so as to see for himself if it was what it was represented to be, and that Jennette said he believed Labounty was telling the truth, and would not go there before buying. Jennette did not deny this. There is no proof that Labounty did not have good title, nor is there any proof that the parties in possession had any right to remain there. Jennette made no effort to assert his rights under his deed.

When Jennette and wife reached Kankakee they immediately moved back into their old home. The evidence leaves it uncertain whether the building was vacant or whether Jennette's mother was still occupying it. Having obtained possession of their former property, Jennette and wife went to see H. L. Richardson, an attorney. He was busy trying a lawsuit, and they came across D. H. Paddock, another attorney. They stated to him their troubles and he invited them into his office and heard their story in full. He told them he believed they had been defrauded, and could get their property back, but they might have to pay back what they had received. He sent an officer for Germain, took the latter into his inner office, and obtained from him an offer of settlement, which he communicated to Jennette and wife, and they accepted. According to their version, Paddock told them they must decide in ten minutes or they would lose their property. Paddock's version seems to be that he was anxious the offer should be accepted before Germain had a chance to back out. The

settlement proposed and carried out by the execution of the papers now in question was that Jennette should retain the Florida property (which Paddock says they claimed could be readily sold and showed him letters to that effect), that Jennette should have back his Kankakee property, and that he should repay to Germain the $200 he, Jennette, had received, the $150 paid Mrs. Labounty, the $100 paid Labounty, and $50 for Germain's services and expenses. Germain agreed to give him two years in which to pay, and Jennette was to secure payment by a trust deed upon the property. The note in question for $500 covered the amounts just specified. It was also arranged that Paddock should retain the Florida deed and should endeavor to effect a sale of the Florida property for Jennette, and a note was drawn for $50 to Paddock to secure him for services he might render in the transaction. Paddock testified he believed this to be a favorable settlement for his clients to make. In order to get back the title to their Kankakee property, except by a settlement, they must bring a suit in equity. Jennette could not read or write, and Paddock found neither he nor his wife could give a clear account of the transaction, and they claimed that conversations between Labounty and Germain in their presence had been in French, which was not understood by Mrs. Jennette at least. There is nothing to show that Paddock did not advise his clients wisely, nor that he was guilty of any fraud or of any collusion with Germain. Nor is it shown that the settlement was in fact unreasonable and a fraud upon Jennette. Although Jennette and wife intended to see Richardson, yet it is clear that finding Richardson busy, and coming across Paddock in the hallway leading to both their offices, they did consult Paddock as their attorney. The papers were not actually delivered till next day, so that they had an opportunity for reflection. A few days later one of them came to Paddock and got the deed of the Florida property and sent it to Florida and had it recorded. Even if the original transaction was a fraud upon Jennette, still the settlement

made by Jennette and wife when they knew all the facts, and the benefit of which settlement they retained till about the time this bill was filed, when they offered to return the Florida property, is not successfully assailed by the proof in this record. Paddock testified he desired nothing under his note except repayment of a small disbursement.

The decree is therefore affirmed.